IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-00531-RBJ-KLM

JOHNS MANVILLE CORPORATION, a Delaware corporation, and
JOHNS MANVILLE, a Delaware corporation,

 Plaintiffs,

v.

KNAUF INSULATION, LLC, a Delaware corporation and
KHAUF INSULATION GMBH, a German corporation,

 Defendants.

---

# ORDER

---

 This matter is before the Court on defendants Knauf Insulation, LLC's and Knauf Insulation GMBH's ("Knauf") four pending motions: (1) motion for summary judgment, ECF No. 161; (2) motion for partial summary judgment, ECF No. 163; (3) motion for partial summary judgment, ECF No. 164; and (4) motion for summary judgment, ECF No. 165. For the reasons below, the Court DENIES these motions.

## BACKGROUND

 Johns Manville Corporation and Johns Manville (collectively "JM") is an established manufacturer in the insulation and fiberglass industry. ECF No. 114 at 7. JM manufactures fiberglass insulation through a process called rotary fiberization, in which molten glass is propelled through tiny holes in the walls of metal discs spinning at high speeds. *Id.* at 7–8. These discs are known as "spinner discs." *Id.* at 8. JM is therefore "vigorously engaged" in research and development of fiberization and spinner disc technology. *Id.* This research

includes the development and acquisition of longer-lasting and better-performing metal alloys with which to manufacture spinner discs. *Id.*

Two such metal alloys are at issue in these motions. The first, RM-3, is a publicly-available alloy. The second is referred to internally at JM as GX-4. ECF No. 114 at 8. JM developed and has been using GX-4 since the 1990s. *Id.* Knauf uses a materially identical alloy, which it refers to as RM-4. ECF No. 181-13 at 31:6–32:4. After research and development, JM has largely replaced GX-4 with a "unique, nonobvious" alloy it refers to as C05. *Id.* at 9; *see also* ECF No. 181–11 (noting that 90 percent of JM's spinners are made with C05 today, while the remainder are made with GX-4).

JM employed metallurgist Walter Johnson from 1992 to 2007. ECF No. 114 at 10–12. From 1992 to 2004, Johnson "played a significant role" in JM's insulation business, including as "the named inventor of at least four JM patents related to insulation and spinner discs." *Id.* at 11. Johnson was aware of and involved in the development of confidential and proprietary information relating to insulation and spinner discs, including trade secrets related to manufacturing protocols, designs of spinner discs and testing data for alloys, and refining and casting specifications used with third-party vendors. *Id.* at 11. From 2004 to 2007, Johnson moved from JM's insulation business to its roofing department, which involved very little metallurgy. ECF No. 177-1 at 34:14–25; 36:22–37:4.

Johnson voluntarily retired from JM in April 2007, informing JM that he was "going fishing." ECF No. 177-1 at 87:13–18. Upon retirement, he entered a contract to serve as a consultant to JM, but never did any consulting work for JM. *Id.* at 15:16–22. In May 2007, however, Johnson began working as the head of the spinner program at Knauf—one of JM's competitors in the fiberglass insulation market. ECF No. 165-1 at 1; *see also* ECF No. 114 at 12.

Johnson worked as a Knauf employee until November 2015, when Knauf terminated him after allegedly discovering that he possessed confidential JM materials on Knauf servers and files. ECF No. 114 at 13.

JM alleges that Knauf did not manufacture spinner discs before Johnson joined the company, choosing instead to purchase them from third parties, but that Knauf began manufacturing its own spinner discs after Johnson joined in 2007. *Id.* Knauf contracted with one particular spinner disc vendor, Owens-Corning, from at least 2005 to 2010. *See* ECF No. 181-9 at 10. Knauf decided to start moving away from Owens-Corning around 2006. ECF No. 181-14 at 47:12–21.

JM learned that Johnson was working at Knauf at least by June 2007. ECF No. 161-12 at 3. Emails in June 2007 between JM's intellectual property-counsel and its Vice President of Research and Development and Chief Technology Officer reflect discussions about Johnson's working at Knauf. *Id.*, *see also* ECF No. 161-14 at 74:13–74:20. JM alleges that it discovered that Knauf was using JM trade secrets in 2014, when its employees observed JM's "C05" designation on Knauf labels. ECF No. 114 at 13.

JM filed suit against Knauf and Johnson in this Court on March 13, 2015. ECF No. 1. Subsequently, in its First Amended Complaint, filed on February 23, 2016, JM raised claims for (1) trade secret misappropriation in violation of the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101-110 (CUTSA) against both Knauf and Johnson; (2) breach of contract against Johnson; and (3) breach of the implied covenant of good faith and fair dealing against Johnson. ECF No. 114 at 1–2. JM subsequently agreed to dismiss all claims against Johnson in this case without prejudice; these claims will be dismissed with prejudice either when Johnson testifies in this matter or if the remaining claims against Knauf are dismissed or otherwise resolved without

potential for appeal.  ECF No. 151-1 at 2.  Knauf now moves for summary judgment and partial summary judgment on various grounds, as discussed herein.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing An*derson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

Knauff's motions for summary judgment and partial summary judgment raise four discrete issues: (1) whether JM's claim for trade secret misappropriation is barred by the statute of limitations; (2) whether Knauf is liable for trade secret misappropriation with respect to (a) testing data and specifications related to the RM-3 alloy and (b) the specific formula for the RM-4 alloy; (3) whether Knauf should be liable for certain money damages; and (4) whether Knauf should be released from its liability through the theory of respondeat superior.  The Court will address each motion in turn.

**A. <u>Statute of Limitations [ECF No. 161].</u>**

First, Knauf moves for summary judgment on the grounds that JM filed its action for trade secret misappropriation after the three-year statute of limitations had run. ECF No. 161 at 1. According to Knauf, the CUTSA "expressly provides a three-year statute of limitations for an action of *threatened* trade secret misappropriation." *Id.* at 7 (citing CUTSA §§ 103, 107). Knauf argues that JM was aware of the threat of trade secret misappropriation in 2007, so its 2014 complaint was outside the three-year statute of limitations. *Id.* at 8.

JM cites the CUTSA's statute of limitations, which makes no mention of threatened misappropriation: "an action for trade secret misappropriation must be brought within three years after the misappropriation 'is discovered or by exercise of reasonable diligence should have been discovered.'" ECF No. 177 at 1 (quoting C.R.S. § 7-74-107). Moreover, because the CUTSA's single reference to threatened misappropriation occurs in the context of injunctive relief, JM argues that this reference is irrelevant here. As a result, JM argues that Knauf's "threatened misappropriation" statute of limitations constitutes an improper legal standard, and thus that its motion for summary judgment should be denied as a matter of law. I agree.

Contrary to Knauf's contentions, the only reference to threatened misappropriation in the CUTSA arises in the context of injunctive relief. *See* C.R.S. § 7-74-103 (providing that temporary and final injunctions may be granted "to prevent or restrain actual or threatened misappropriation of a trade secret."). There is no indication from the statute that threatened misappropriation is meant to be a trigger to start running the three-year time period. *See* C.R.S. § 7-74-107. Knauf argues that as a matter of statutory construction, "misappropriation" must refer to both "actual" and "threatened" in each instance, since the statute refers to both in the context of injunctive relief. ECF No. 187 at 1. However, the absence of such modifiers for the

term outside the context of injunctive relief instead supports an inference that threatened misappropriation is relevant only for injunctive relief, and not otherwise. *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) (quoting *Massachusets v. Morash*, 490 U.S. 107, 115 (1989) (In interpreting a statute, "'we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law.'").

Additionally, Knauf's argument ignores the fact that injunctive relief is by its nature concerned with preventing prospective harms, but such concern does not extend to other facets of the statute, which addresses acts of misappropriation that have already occurred. Knauf's reliance on *Xantrex Tech. Inc. v. Advanced Energy Indus.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882 (D. Colo. May 23, 2008) to argue to the contrary is inapposite. In that case, the Court found only that "the Colorado legislature intended to recognize something less than actual misappropriation of a trade secret *as appropriate for injunctive relief* within the framework of the statute." *Xantrex*, 2008 WL 2185882 at \*19 (emphasis added). Indeed, an inquiry into the existence of a threatened injury is essential to a court's decision to grant a preliminary injunction: such relief is deemed appropriate when, among other factors, "the *threatened injury* outweighs the harm that the preliminary injunction may cause the opposing party." *Id.* at \*13 (emphasis added). A court considering whether to grant injunctive relief in a trade secret misappropriation case would thus naturally consider the existence of a threatened injury. But there is no reason to believe such an inquiry would occur in other contexts.

In short, a cause of action for damages for trade secret misappropriation does not accrue until the plaintiff knows or should with reasonable diligence know that the defendant "*used* plaintiff's trade secrets," even when the plaintiff previously knew that the defendant possessed and likely would use its trade secrets to develop a product. *See Chasteen v. UNISIA JECS Corp.*,

216 F.3d 1212, 1219 (10th Cir. 2000) (citing *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1258, 1265–66 (N.D. Cal. 1991)). The *Intermedics* court emphasized that plaintiffs should not be pressured to file suits "based merely on suspicions and fears" but instead should be given time to confirm their suspicions of trade secret misappropriation before being required to file suit. *Intermedics*, 775 F. Supp. at 1266.

Because JM is neither seeking injunctive relief for nor alleging a claim of threatened misappropriation in this case, and since the statute does not provide a cause of action for damages for threatened misappropriation in the first place, Knauf's reference to threatened misappropriation is inapplicable here.[1] Thus, as a matter of law, Knauf's first motion for summary judgment fails.

### B. Trade Secret Liability for RM3 and RM4 Alloys [ECF No. 163].

Knauf next moves for partial summary judgment on the basis that it is not liable for misappropriation related to spinners made from the RM-3 and RM-4 alloys. ECF No. 163 at 1. Because the arguments for each alloy are distinct, I will address them separately below.

RM-3 Alloy.

Both parties concede that the RM-3 alloy is a "'decades'-old public-domain alloy." ECF No. 163 at 2; ECF No. 180 at 7. Thus, Knauf argues that JM cannot show that Knauf would

---

[1] Knauf argues that JM's original complaint contained an allegation of threatened misappropriation in the form of "inevitable disclosure" of trade secrets that was removed from its first amended complaint. ECF No. 187 at 3. Knauf contends that deleting this claim "changes it from a binding admission to an *unrebutted* evidentiary admission." *Id.* (citing *Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1431–32 (10th Cir. 1990)). This argument misconstrues JM's original complaint and the law on evidentiary admissions. JM originally alleged that both Knauf and Johnson misappropriated trade secrets. ECF No. 1 at 21. JM also alleged that Johnson had used and either already disclosed or would "inevitably disclose" trade secrets at Knauf. *Id.* The removal of this claim against Johnson in the first amended complaint—in addition to the dismissal of all claims against Johnson (*see* ECF No. 151)—did not impact the claims of existing misappropriation as pled against Knauf. Moreover, contrary to Knauf's argument that this claim is an "unrebutted evidentiary admission," superseded or withdrawn pleadings in the same case are ordinary evidentiary admissions, which may be controverted or explained by the party that withdraws them. 6 Michael H. Graham, Handbook of Fed. Evid. § 801.26 (7th ed., 2016).

have been unable to make RM-3 spinners "but for" the misappropriation of JM's trade secrets.

*Id.* (citing *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 74 (10th Cir. 2007) (unpublished). However, JM's claim for trade secret misappropriation with respect to the RM-3 alloy is not related to the alloy's formula, but is instead related to JM's confidential testing data and "refining and casting" specifications for the alloy. ECF No. 180 at 14. Moreover, JM argues that the correct standard for misappropriation is not whether Knauf could have manufactured its discs "but for" JM's trade secrets, but simply that Knauf benefitted from the use of its trade secrets in the production of Knauf's RM-3 spinner disc. *Id.* at 2 (citing *Cartel*, 249 F. App'x at 74). I agree with JM.

As JM correctly asserts, in *Cartel,* the Tenth Circuit interpreted Colorado law (the Colorado Uniform Trade Secrets Act) to require a plaintiff to show only that the alleged trade secret misappropriator benefitted from the use of the trade secret, not that the misappropriator would not have been able to make its product "but for" the use of the trade secret. *See, e.g.*, *Cartel*, 249 F. App'x at 74. There, a provider of real estate broker price opinions sued a bank for misappropriating its secret list containing contact information for real estate brokers who could provide these opinions. *Id.* at 76. The Tenth Circuit confirmed that Cartel need not show that the Bank could not have created a list of brokers without Cartel's list, but instead need only show "the Bank benefitted from the misappropriation of Cartel's information." *Id.* at 74. The court found that Cartel had provided sufficient evidence for the jury to infer that the Bank had used Cartel's names, thereby side-stepping the process of creating its own list and generating a savings or a profit. *Id.* at 76.

Knauf cites *Cartel* to support its "but for" standard, but as noted, that case does not support Knauf's argument. Knauf's citations to *Kaiser Foundation v. Sharp*, 741 P.2d 714

(Colo. 1987) and *Runiks v. Peterson*, 392 P.2d 590 (Colo. 1964) are similarly inapposite. *See* ECF No. 163 at 3–4. *Kaiser* explains "but for" causation in a negligence context, which is irrelevant to this case (741 P.2d at 719), whereas *Runiks* addresses the specificity required for damages calculations, which is similarly irrelevant to the argument at hand (392 P.2d at 590).

Here, JM does not allege that Knauf could not have created RM-3 spinner discs without JM's testing data or the refining and casting specifications, but instead that Knauf saved time and money by using these JM trade secrets. ECF No. 180 at 14. Because Knauf relies on the wrong legal standard, partial summary judgment on this issue is inappropriate.

However, even if Knauf had brought this motion under the correct "benefitted" standard, there are genuine issues of material fact that preclude summary judgment. Chief among these are whether Knauf was, in fact, manufacturing RM-3 spinner discs before Johnson's arrival, which would indicate whether, and to what extent, Knauf benefitted from JM's testing data and specifications in creating its own RM-3 spinner discs. *Compare* ECF No. 163-1 at 103:4–23 (Mr. Gaul agreed in his deposition that "before Dr. Johnson ever came to Knauf, Knauf had made spinners with RM-3") *with* ECF No. 180-15 at 2 (Knauf table showing no RM-3 spinners shipped until 2008) *and* ECF No. 180-16 at 189:7–24 (Knauf's Rule 30(b)(6) witness Amy Beyer testified that RM-3 spinner discs produced in 2008 were in the "development period" for the alloy.) Similarly, determining when Knauf began mass-producing RM-3 spinner discs will shed light on whether it was likely using JM's testing data and specifications to speed the production of its discs. *See* ECF No. 180-13 at 105:18–107:2 (Mr. Gaul testified that Knauf used JM's RM-3 specifications to continue production of RM-3 spinners after Johnson joined Knauf.). Thus, a reasonable jury could find that Knauf did, in fact, benefit from the use of JM's trade secret RM-3 specifications.

Because Knauf is not entitled to summary judgment as a matter of law under its proffered "but for" standard, and because there are genuine issues of material fact under the correct "benefitting from" standard, partial summary judgment with respect to liability for trade secrets related to the RM-3 alloy is DENIED.

RM-4 Alloy.

Unlike the RM-3 alloy, the formula for the GX-4 alloy (known at Knauf as RM-4) is itself considered a trade secret by JM. Knauf, however, moves for summary judgment on JM's trade secret misappropriation claim with respect to the RM-4 alloy formula, arguing that the formula was published, and is therefore not actually a trade secret. In particular, Knauf points to the publication of information about the formula, including ranges of weight percentages for the elements in the formula, by Walbar (a JM vendor) in 2002, and by JM in patents '979 and '836 in 2001 and 2002, respectively. *See* ECF No. 163 at 5, 7–8. Because these ranges of the elements' weight percentages were disclosed publicly, Knauf argues that, as a matter of law, it cannot be found to have misappropriated a trade secret by using JM's specific formula for GX-4, which falls generally within the published ranges. ECF No. 163 at 13; ECF No. 194 at 5. Moreover, Knauf argues that even if the exact formula for GX-4 does diverge slightly from the ranges published in the vendor's and JM's patents, JM has failed to show that the difference in the formulas is "substantial" and that this difference conferred a "competitive advantage" on JM. ECF No. 194 at 4. JM counters that the publication of the ranges of the elements in the GX-4 formula did not disclose the specific trade secret formula for GX-4, and that the formula's secrecy has therefore been maintained. ECF No. 180 at 17.

JM's formula for GX-4 consists of seven key elements: Cobalt, Chromium, Nickel, Molybdenum, Carbon, Silicon, and Manganese. ECF No. 163-18 at 7. The alleged trade secret

formula describes each element in terms of its percentage by weight in the overall composition. *See id.* at 7–8. JM's formula describes a "minimum," "maximum," and "aim" for the weight percentages of each element in the formula; the "aim" represents the formula's ideal form. *Id.*; *see also* ECF No. 180 at 11. Thus, for example, the range of weight percentages for Chromium provided in JM's formula is 31.0 (min), 32.50 (aim), and 34.0 (max). ECF No. 163-18 at 23.

The first patent at issue (the "Walbar patent") was published by JM's third-party vendor in 2002 and related to gas turbine jet engine alloys. ECF No. 180-17 at 164:2–10. This patent included Walbar's work with JM's GX-4 alloy, referring to it by name as a "commercially available" alloy, and including test data and graphs associated with GX-4. *See* ECF No. 163-10 at 5, 11.

Unlike the Walbar patent, JM's patents (the '836 and '979 patents) referred to the elements in the GX-4 formula using relatively broad weight percentage ranges that generally encompass JM's specific formula. *See, e.g.*, ECF No. 163 at 9 (the range for Silicon is provided as .50–.80 by weight in JM's GX-4 formula, and as .25– 1.0 in the '836 and '979 patents.). However, in some instances the ranges published in the patents do not encompass JM's specific formula. *See, e.g.*, ECF No. 163 at 9 (the range for Cobalt is provided as 46.9–54.8 percent by weight in JM's GX-4 formula, but as 22.0– 54.0 percent by weight in the '836 patent; the range for Carbon is provided as 0.40–0.50 by weight in JM's GX-4 formula, but as 0.55–0.65 by weight in the '979 patent). Rather than falling somewhere within the general range of weights for each element as published in the patents, Knauf's RM-4 formula matches JM's GX-4 formula exactly with respect to the min, max, and aim for the seven key elements. *See* ECF No. 163-18 at 23.

"What constitutes a trade secret is a question of fact for the trial court." *Colo. Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990) (citing *Network Telecomm., Inc. v. Boor-Crepeau*, 790 P.2d 901 (Colo. App. 1990); *see also Kodekey Electronics, Inc. v. Mechanex Corp.*, 486 F.2d 449, 454 (10th Cir. 1973). Factors that may be considered to determine whether a trade secret exists include the extent to which the information is known inside and outside the business; the precautions taken to guard the secrecy of the information; the savings effected and the value to the holder in having the information; the effort and resources expended in developing the information; and the effort required for others to duplicate the information. *Colo. Supply Co., Inc.*, 797 P.2d at 1306 (citing *Network*). "Publication in a patent destroys the trade secret, because patents are intended to be widely disclosed—that is the quid pro quo of the patentee's exclusive right to make and sell the patented device." *BondPro Corp. v. Siemens Power Generation, Inc.*, 436 F.3d 702, 706–07 (7th Cir. 2006) (internal citations omitted). In this case, Knauf argues that the GX-4 formula is not a trade secret since its elements have been published in patents. Because the question of whether GX-4 is a protected trade secret is a fact question genuinely disputed by the parties, I cannot conclude as a matter of summary judgment that the GX-4 formula is not a trade secret.

Another judge in this district has determined that while "publicly disclosed information in a patent or patent application is not eligible for trade secret protection . . . there are genuine issues of material fact as to whether and to what extent Plaintiff's trade secrets were disclosed in the patents." *Port-a-Pour v. Peak Innovations, Inc.*, No. 13-cv-01511-WJD-BNB, 2016 WL 7868828 at *6 (D. Colo. June 7, 2016). In *Port-a-Pour*, the plaintiff's patent application allegedly described the purported trade secrets with great detail and precision. *Id.* However, the

Court found that despite the plaintiff's detailed disclosure in the patent application, there was a genuine issue of fact as to whether the trade secret had been publicly revealed. *Id.*

Knauf cites *Rumnock v. Anschutz*, 384 P.3d 1262, 1265 (Colo. 2016) for the proposition that "[w]here there is no genuine dispute of fact, however, we may decide as a matter of law whether the information is a trade secret or otherwise confidential." Notably, this proposition follows several reiterations of the rule that whether something is a trade secret is a question of fact for the trial court. *Id.* Additionally, the *Rumnock* court relies on *Gognat* for the principle that trade secret status may be decided as a matter of law, but in *Gognat* it was undisputed that the information at issue constituted a trade secret. *Gognat v. Ellsworth*, 259 P.3d 497, 504 (Colo. 2011). In that case, the court was merely assessing the "undisputed facts" about whether the information misappropriated "amounted to a single trade secret within the meaning of the Act" or constituted multiple secrets. *Id.* The court was thus required only to apply "the meaning of the term 'trade secret' as used in the [CUTSA]" as a matter of law. *Id.* at 505. As such, the principle espoused in *Gognat* and later emphasized in *Rumnock* is inapplicable here, where there are disputed facts about whether the specific formula for GX-4 constitutes a trade secret. In such a situation, the Court may not decide whether information constitutes a trade secret as a matter of law.

In this case, there are genuine issues of material fact related to whether JM's trade secret GX-4 formula was disclosed in the three patents referenced by Knauf. Knauf's experts contend that "no substantial difference exists between spinners made from JM's chemistry specification for the GX-4 alloy and the GX-4 alloy that is readily ascertainable from the publications." ECF No. 163 at 10. In his declaration Dr. Johnson stated that the Walbar patent would allow "at least a PhD metallurgist" to "readily ascertain[]" the GX-4 alloy, albeit under the assumption that such

a metallurgist would know to add Carbon to the elements. ECF No. 163-9 at 3. In contrast, Dr. Ghorpade, the JM metallurgist who developed GX-4, noted that while the Walbar patent disclosed aspects of GX-4, it did not disclose the alloy's formula. ECF No. 180-17 at 163:20–165:12. Additionally, because the patent was issued in the context of gas turbine jet engines, it would not indicate that such an alloy would be used for fiberglass in the first place. *Id*.

The parties similarly dispute whether the publication of information describing GX-4 in JM's '836 and '979 patents constituted the disclosure of a trade secret or something short of that. Knauf argues that JM's publication of the '979 patent in 2001 revealed "the basic GX-4 alloy" with a few additions, while its publication of the '836 patent in 2002 "discloses and claims all of the elements of GX-4." ECF No. 163 at 7–8. However, Knauf's expert Dr. McGarry testified that he had not identified "any publication by [JM] or public dissemination by [JM] of the formula for GX-4." ECF No. 180-12 at 53:12–15. Similarly, Knauf's second expert Dr. Eager noted that "it would be statistically improbable" for a metallurgist to arrive at the precise GX-4 formula, and that "[n]o metallurgist would expect to" despite the publication of the formula's ranges in the patents. ECF No. 180-20 at 179:6–12, 180: 18.

Although there do appear to be genuine issues of fact relating to whether these three publications disclosed JM's trade secret, Knauf points to a case in which the court found that divulging a broad range of chemicals in a patent amounted to the disclosure of the narrower, ostensibly protected formula within the disclosed range. In *Ultimax Cement Mfg. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009), the Federal Circuit upheld a district court's finding that under California's Uniform Trade Secrets Act, the publication of a Japanese patent containing a formula's broad range of ingredients precluded trade secret protection for the more specific trade secret formula within that range. The *Ultimax* court thus affirmed the grant of

summary judgment on the grounds that plaintiffs had not proven the existence of a trade secret, "therefore defeating a trade secret claim." *Id.* Thus, Knauf argues that the patents disclosing the general formula for GX-4 similarly preclude any trade secret protection for JM's specific formula. ECF No. 163 at 13. JM argues that *Ultimax* should not govern in this case, since it involved the application of California law. ECF No. 180 at 17. As adopted in Colorado, the Uniform Trade Secrets Act is to be "applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among states enacting it." C.R.S. § 7-74-109. The Tenth Circuit notes that "this court, therefore, has been encouraged by the Colorado legislature to rely on interpretations of other states' versions of the UTSA." *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1217 n.3 (10th Cir. 2000).

Despite consideration of the *Ultimax* opinion, I note that there is no governing law in this state or circuit mandating such a result in this case, as far as I am aware.[2] Instead, as noted above, courts in this circuit emphasize that trade secret status is a question of fact. Additionally, the *Ultimax* opinion concerned a specific ratio of elements that the court found was encompassed by "the publication of the more general combination" in a patent. 587 F.3d at 1355. In this case, in contrast, while the majority of the ranges published in the patents do encompass JM's specific ranges, in at least two cases these ranges do not encompass JM's specific range. *See* ECF No.

---

[2] Knauf's reliance on *Fuels Research v. Husky Oil Co.* to contend that *Ultimax*'s holding has been adopted in Colorado overstates the Court's holding. *See* ECF No. 163 at 13(citing *Fuels Research*, No. C-2403, 1974 WL 20181 at *2–3 (D. Colo. June 28, 1974)). In *Fuels Research*, plaintiffs lost trade secret protection when they divulged their formulas in a patent. 1974 WL 20181 at *6. However, there is no indication that *Fuels Research* involved broad ranges of elements as in this case; instead, the precise formulas themselves seem to have been published: "[t]he patent, including the chemical formulas of the additives, was published." *Id.* at *3.

163 at 9 (showing that the JM patents do not completely encompass the specific ranges for Carbon and Cobalt). As a result, *Ultimax* does not govern the outcome in this case.[3]

In this case the parties debate whether the disclosure of ranges of elements in the patents constituted disclosure of the specific amounts of elements used by JM in its GX-4 alloy. Thus, the parties have established that a genuine issue of material fact exists as to whether the specific GX-4 formula is a trade secret despite the existence of the patents. Because there is a genuine issue of fact regarding whether GX-4 is a trade secret, summary judgment on this issue is DENIED.

### C. Money Damages [ECF No. 164].

In its second motion for partial summary judgment, Knauf argues that the Court should: (1) restrict JM's money damages to a "head start" period of 39 months; (2) limit unjust enrichment damages based on the use of JM's specifications to $25,000; and (3) exclude any unjust enrichment damages based on the use of JM's testing data. Each claim will be addressed in turn. For the reasons discussed below, summary judgment is DENIED on each claim.

#### 1. Limit Damages to "Head Start" Period.

Knauf first moves to limit JM's damages for Knauf's alleged trade secret misappropriation to cost savings Knauf incurred during a 39-month "head start" period from May 2007 to August 2010. ECF No. 164 at 11. Knauf explains that such head start periods represent "the amount of time the defendant saved by misappropriation" in "cases where an available alternative would require time to implement." ECF No. 164 at 10. In this case, Knauf alleges that this head start period represents the time it would have taken Knauf to create "the

---

[3] Knauf argues that JM has failed to show that any variation between JM's specific formula and the published ranges is "substantially different." ECF No. 194 at 3. This issue is similarly a fact issue more appropriate for the jury than for this Court to decide as a matter of summary judgment.

best spinner" using a public domain alloy, at a cost equal to or less than using RM-4 spinners. *See* ECF No. 196 at 1.

Knauf derived its 39-month period from deposition testimony of JM's Rule 30(b)(6) witness Mr. Gaul, who opined that creating a spinner alloy like GX-4 from scratch would take between 40 and 52 months. *See* ECF No. 164 at 10; *see also* ECF No. 164-4 at 8:23–9:7. Knauf argues that no misappropriation would have occurred during the twelve months of the timeline allotted to inventory build-up, leaving 39 months during which Knauf was allegedly misappropriating trade secrets. ECF No. 164 at 10. In another context, Mr. Gaul testified that he could hypothetically select a public domain spinner alloy recipe in one month that would "give you the best spinner you ever had." ECF No. 164-4 at 46:2–47:4. Combining these two separate lines of testimony, Knauf now argues that "[i]t is undisputed fact . . . that there is a public domain alloy that could be put into production in 39 months to give 'the best spinner you ever had.'" ECF No. 196 at 1 (citing ECF No. 164-4)). Knauf contends that the head start period should begin in May 2007 when Dr. Johnson joined Knauf, and thus end 39 months later in August 2010. ECF No. 164 at 11 (citing *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 74 (10th Cir. 2007) and *Russo v. Ballard Med. Prod.*, 550 F.3d 1004, 1020 (10th Cir. 2008). After that date, Knauf argues that any benefits from the trade secrets would have ended, "because by then Knauf would have completed the public domain 'best spinner' development and started using that alternative." ECF No. 196 at 2.

JM counters that Knauf's head start argument ignores JM's theory of damages, which contends that Knauf misappropriated JM's trade secrets during the entire period that it used JM's RM-3 testing data and specifications, and that Knauf continues to misappropriate the JM GX-4 alloy. *See* ECF No. 181 at 12. According to JM, Knauf's argument implies that Knauf's only

benefits from misappropriation accrued during the development of its discs, rather than from the period when it amassed and sold the discs.  Moreover, JM argues that the head start period calculated by Knauf is not a legitimate measure, but was instead concocted using hypothetical information.  JM points out that Mr. Gaul's 40–52 month estimate is completely hypothetical, as it does not identify an actual alloy, does not address whether the hypothetical alloy would perform according to Knauf's needs, and does not account for the costs of producing the spinner discs (including refining, casting, finishing, and drilling the discs).  ECF No. 181 at 14–15.  I agree.

There are two flaws to Knauf's argument.  First,  I do not agree that the head start theory is compelled as a matter of law

Knauf cites *Cartel* and *Russo*, but in my view neither case supports Knauf's argument.  In *Cartel*, the Tenth Circuit affirmed the lower court's holding that the jury could consider the defendant's ill-gotten gains based not only on the head start period the defendant gained by misappropriating trade secrets, but also from the defendant's profits attributable to its use of trade secrets.  *Cartel*, 249 F. App'x at 73–74, 75–76.  In *Russo*, the Tenth Circuit found that the jury should not be instructed to limit damages from trade secret misappropriation to the "so-called 'head start' or 'lead time,'" but should instead be instructed to award unjust enrichment damages for the time period when the trade secret was entitled to protection, plus "any additional period, if any, that you find that the trade secret afforded the particular Defendant a competitive advantage."  *Russo*, 550 F.3d at 1020.  The court in that case noted that if the jury should find that the head start period was the only time when benefits from misappropriation accrued, then it could award damages accordingly, but such a jury instruction was not necessary as a matter of law.  *See id.*

Thus, as applied to this case, *Cartel* and *Russo* indicate that JM may be entitled to damages from any period during which the trade secrets afforded Knauf a competitive advantage and for any profits Knauf derived from its use of JM's trade secrets, rather than just those benefits that accrued during a hypothetical "head start" period. Additionally, as *Russo* indicates, whether to limit damages to such a head start period or to award them more broadly is a question of fact for the jury. A reasonable jury could find that a head start period should not apply in this case because Knauf benefited from the alleged trade secrets beyond the head start period. *See, e.g.*, ECF No. 164-2 at ¶¶ 82–84 (Mr. Gaul opining that Knauf benefitted from the JM specifications until Knauf rewrote them in 2011, or even beyond 2011); *id.* at ¶ 69 (Mr. Gaul pointing out evidence of Knauf employees reviewing testing data as late as 2014). Because the application of a head start period is for the jury to decide, and because there are genuine issues of material fact relating to whether such a period should apply in this case, limiting damages to a head start period would be inappropriate at the summary judgment stage.

Second, even if a head start period were presumptively appropriate, there are genuine issues of material fact regarding the time period selected by Knauf, since the parties dispute the hypothetical 39-month spinner development timeline as an alternative that was "open" to Knauf. As noted, Knauf's proposed 39-month period is derived from Mr. Gaul's 40–52 month hypothetical spinner disc development timeline. Such a timeline corresponds to a hypothetical alternative Knauf *might* have considered, though Knauf now argues that this scenario is the low-cost alternative to which its actual course of action *must* be compared. However, JM contends that there is no evidence that such an alternative was, in fact, "open" to Knauf, such that this timeline is irrelevant. *See* ECF No. 181 at 13–14. In contrast, JM assessed only the "factually supported alternatives available to Knauf," which it determined to be continuing to lease spinner

discs from Owens-Corning. ECF No. 181 at 14. JM contends that Mr. Gaul's 39-month timeline has not been proven as the time period during which an alternative alloy could actually be successfully developed, and that this alternative could prove to be more expensive than Mr. Gaul predicted, and thus might not be a valid low-cost alternative. In other words, JM argues that there are too many unknowns regarding Mr. Gaul's hypothetical scenario to rely on it as a low-cost alternative. *See* ECF No. 181 at 15. I agree that there is a genuine issue of material fact as to whether Mr. Gaul's 39-month timeline is reliable as a head start period, given the many unknowns in this computation.

Knauf counters that JM cannot deviate from what Mr. Gaul testified, since he is JM's Rule 30(b)(6) witness. In *Vehicle Market Research, Inc. v. Mitchell International, Inc.*, the Tenth Circuit noted that "'a corporation *generally* cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative'" in the summary judgment context. 839 F.3d 1251, 1259–60 (10th Cir. 2016) (quoting Moore's Federal Practice—Civil §30.25[3]). However, the court noted that this proposition is limited to "the context in which an affidavit conflicts with the Rule 30(b)(6) deposition *without good reason*," citing cases where deponents intentionally offer misleading responses only to "correct" them after discovery, or have no adequate explanation for testimony inconsistent with their Rule 30(b)(6) testimony. *Id.* at 1260. The court goes on to explain that the testimony of a Rule 30(b)(6) representative "is merely an evidentiary admission, rather than a judicial admission." *Id.* at 1261.

In this case, therefore, JM is entitled to dispute Mr. Gaul's *hypothetical* 40–52 month scenario because in doing so JM is not "present[ing] a theory of the *facts* that differs from" Mr. Gaul's. *Id.* at 1259 (emphasis added). Additionally, his testimony is "merely an evidentiary admission." *Id.* at 1260–61. Moreover, even if JM did have to accept Mr. Gaul's head start

calculation as fact, there are other genuine issues of material fact related to whether this head start period ought to apply at all, as noted above.

Because the application of a head start period is a question of fact about which there are genuine issues, Knauf is not entitled to limit damages to such a head start period as a matter of law, and summary judgment is therefore inappropriate. Additional issues of material fact relating to the appropriate length of such a head start period, should it be found to apply, similarly preclude summary judgment on this issue.

2. <u>Limit Unjust Enrichment Damages from Specifications to $25,000.</u>

In its second damages-related claim, Knauf moves to limit JM's unjust enrichment damages from Knauf's allegedly using JM's specifications to the cost savings Knauf gained thereby. ECF No. 164 at 8. Using the "standard of comparison" method, which measures the difference between the costs incurred using trade secrets and the costs that would be incurred using an open alternative, Knauf claims this number is $25,000. Knauf derives this figure from testimony from JM's expert Mr. Gaul that it would cost "in the neighborhood of $25,000" to write "refining and RM-3 casting" specifications from scratch. *See* ECF No. 164 at 8; ECF No. 164-7 at 119:13–16. Knauf further argues that JM's experts were unable to quantify any benefit to Knauf from using JM's specifications, aside from saving the initial cost of drafting specifications. *See* ECF No. 164 at 6–7 (citing ECF No. 164-7 at 127:24–132:17, 230:9–233:12; ECF No. 164-8 at 41:24–42:14. 224:8–228:4; ECF No. 164-9 at 6); *see also* ECF No. 196 at 2–3. In particular, Knauf contends that JM cannot establish "direct causation," arguing that JM cannot allege that Knauf gained additional benefits from JM's specifications unless it can show that Knauf would not have been able to make RM-3 or RM-4 spinners but for the specifications. ECF No. 196 at 2. Thus, comparing the benefits Knauf gained by using JM's specifications

(which Knauf contends cannot be quantified) to the costs Knauf would incur under the next available alternative (which Knauf contends are $25,000), Knauf argues that damages for use of JM's specifications must be capped at $25,000.  ECF No. 164 at 8–9.

JM counters that Knauf's argument is improperly limited to the "replacement cost" of JM's misappropriated specifications.  *See* ECF No. 181 at 17–18.  Instead, JM argues that, as a matter of law, it is entitled to the net savings from the benefits Knauf gained by using JM's specifications.  *Id.*  According to JM, these benefits would have accrued during Knauf's "*production* of spinner discs," rather than just during the hypothetical process of creating specifications from scratch.  ECF No. 181 at 18; *see also* ECF No. 164-7 at 121.  Additionally, JM disputes Knauf's contention that JM's experts were unable to quantify any benefit to Knauf of its misappropriation other than the cost savings related to alloy development.  *See* ECF No. 181 at 12.

Summary judgment is inappropriate on this issue for two reasons: first, Knauf improperly attempts to limit JM's damages to compensatory damages as opposed to net benefits, and second, there are genuine issues of material fact related to measuring the appropriate amount of benefits, such that they cannot be capped at $25,000 as a matter of summary judgment.

Regarding the first point, Colorado courts applying the CUTSA allow plaintiffs to recover "'for both compensatory damages and the defendant's profits from the misappropriation.'"  *Cartel*, 249 F. App'x 63 at 73 (quoting *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287, 1289 (Colo. App. 2011)); *see also Russo v. Ballard Med. Prod.*, 550 F.3d 1004, 1021 (10th Cir. 2008) ("[A] misappropriation claim involves an allegation of theft, and it is not unknown to require a thief to return not only what was stolen, but any additional consequential profits" reaped.).  In this case, therefore, JM should be eligible not only for compensation for the

amount Knauf saved by misappropriating JM's specifications, but also for profits earned by Knauf during the production phase by virtue of its use of JM's specifications.  *See* ECF No. 181 at 18.

Second, there are genuine issues of fact relating to the quantification of benefits Knauf gained by allegedly misappropriating JM specifications.  As an initial matter, using the standard of comparison method, the parties disagree as to whether the "open alternative" must be the cheapest available, or may be simply a reasonably available alternative.  While Knauf contends that the alternative considered must be the "least expensive alternative" (its hypothetical $25,000 specification) JM contends it need only be "an available alternative," which it considered to be Knauf's continuing its relationship with Owens-Corning.  *See, e.g.*, ECF No. 164 at 8–9, ECF No. 181 at 18 (the available alternative was "continuing its relationship with Owens Corning for finished discs at a higher price.").

Knauf's cited cases do not support its contention that the alternative must be the least expensive available.  In *International Industrial Inc. v. Warren Petroleum Corp.*, a case involving methods of transportation, the court found that the standard of comparison method "contemplates the comparison of the cost of transportation by means of the use of the trade secret with *a method of accomplishing the same result which would have been open* to defendant had he not appropriated the trade secret." *Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957) (emphasis added); *see also Telex Corp. v. Int'l Business Machines Corp.*, 510 F.2d 894, 932 (10th Cir. 1975) (similarly describing the standard of comparison method as "a comparison of the costs incurred by the defendant using the stolen trade secret, and the costs that would have been incurred had he not used the trade secret.").  Because courts do not require that the alternative considered be the cheapest available, there is no indication that in this case

Knauf's hypothetical $25,000 specification process must be used instead of JM's alternative scenario wherein Knauf would have continued to work with Owens-Corning. Because a reasonable jury could find that JM's scenario was an open alternative, the Court should not rule out such an outcome as a matter of summary judgment.

Additionally, with respect to proving any additional benefits Knauf gained by using JM's specifications, the parties dispute whether such benefits can be or have been quantified. As noted, Knauf argues that as a matter of law JM must prove that Knauf could not have made RM-3 or RM-4 spinners without JM's specifications. Knauf relies on the notion that "[u]njust enrichment awards must be 'traceable to and [be] the direct result of the wrong sought to be addressed'" to conclude that JM must establish that Knauf could not have made RM-3 or RM-4 spinners without JM specifications. ECF No. 196 at 2 (quoting *Runiks v. Peterson*, 155 Colo. 44, 45, (1964)). However, as JM has elsewhere clarified, it is not alleging that Knauf could not have made the spinners "but for" JM's specifications, but instead that Knauf benefited from the use of JM's misappropriated trade secrets. JM alleges that Knauf saved money by using JM's specifications rather than continuing to buy spinners from Owens-Corning. ECF No. 181 at 18; *see also* ECF No. 163-18 at 35 (Mr. Gaul noted that from 2007 to 2011, Knauf's specifications for alloys "were based on and largely overlap" the JM specifications, "allowing Knauf to bypass the process of drafting, editing, and fine-tuning specifications for its own spinner manufacturing processes, its vendor casting processes, and alloy cleanliness control."). JM's expert, Mr. Pedigo, quantified the "savings Knauf gained in producing its discs in-house (using JM trade secrets) instead of the available alternative, continuing its relationship with Owens-Corning for finished discs at a higher price." ECF No. 181 at 18; *see also* ECF No. 164-9 at 10. A

reasonable jury could find that JM has substantiated its theory of how Knauf's savings are traceable to the misappropriation of JM's trade secret specifications.

Because JM should not be limited to compensatory damages, and because there are genuine issues of material fact relating to the amount of damages appropriate for Knauf's alleged misappropriation of JM's specifications, summary judgment is DENIED as to this issue.

### 3. Exclude Unjust Enrichment Based on the Use of JM's Testing Data.

In Knauf's third claim in this motion, it moves to exclude any unjust enrichment damages from the alleged use of JM's testing data. Knauf argues that the benefits it ostensibly gained from using JM's testing data are too vague and cannot be quantified. ECF No. 164 at 9. Knauf also alleges that JM has failed to present evidence of Knauf's making decisions using JM's testing data or evidence that Knauf would have been unable to make RM-3 or RM-4 spinners without JM testing data. ECF No. 196 at 3–4. Finally, Knauf contends that JM must apportion damages attributable to Knauf's use of JM's testing data, as JM may not recover "all profits somehow relatable to the use" of the testing data. *Id.* at 4. Thus, Knauf argues that there is no genuine issue of material fact about the benefits Knauf gained from the use of JM's testing data.

JM counters that the benefits to Knauf of using JM testing data are not vague. ECF No. 181 at 19. JM's expert Mr. Pedigo quantified Knauf's benefits as "the net savings Knauf gained by bringing its spinner discs into production at costs significantly lower than what its [sic] paid to Owens-Cornings for finished spinner discs." *Id.* JM notes that the benefits to Knauf from using JM testing data "are subsumed in those consequential savings." *Id.*

At base, the parties disagree about whether JM should be required to articulate the damages attributable to each form of alleged trade secret misappropriation (*i.e.*, the use of JM's testing data; the use of casting and refining specifications; and the use of GX-4 alloy formula), or

if JM may simply compare Knauf's net savings achieved by creating spinner discs with the alleged help of JM's trade secrets rather than buying spinner discs from Owens-Corning.

"Damages in trade secret appropriation cases are often difficult to ascertain with certainty. However, damages based on mere speculation and conjecture are not allowed . . . . Damages are not recoverable for losses beyond an amount that a plaintiff can establish with reasonable certainty by a preponderance of the evidence." *Sonoco Prods. Co.*, 23 P.3d at 1289 (internal quotations omitted). Thus, there must be "competent evidence to support a damage award," but "uncertainty as to the amount of damages will not bar recovery." *Id.* at 1289–90. In this case JM has provided evidence of Knauf using its testing data (*see, e.g.*, ECF No. 181-2; ECF No. 181-3; ECF No. 181-5; ECF No. 181-6), and its experts' theory of damages is one reasonable way to account for Knauf's use of those data. A reasonable jury could find that JM has sufficiently supported its claim for damages with respect to Knauf's use of JM testing data— along with JM's specifications and GX-4 alloy formula—and it is not for this Court to decide otherwise at this juncture.

Because the parties have substantiated their alternative theories about the correct method of calculating damages associated with Knauf's alleged use of testing data, there is a genuine issue of material fact precluding summary judgment on this issue. Thus, summary judgment on this issue is DENIED.

### D.  Respondeat Superior [ECF No. 165].

Knauf's final motion for summary judgment alleges that JM's claims were brought under an implied "theory of *respondeat superior* arising from Dr. Johnson's conduct" as a Knauf employee. ECF No. 165 at 1. Because JM dismissed its claims against Johnson, Knauf argues that Knauf may not be held derivatively liable under this implied theory of respondeat superior.

*Id.* at 2.  Additionally, Knauf alleges that there was only a single incidence of misappropriation in this case, which was set in motion when Johnson stole JM's trade secrets, and that JM errs when it "parse[s] a single continuing tort into multiple torts at different times due to the later involvement of other 'Knauf employees.'"  ECF No. 188 at 5 (quoting ECF No. 182 at 2 ¶ 8).

JM counters that it did not bring its claims under a respondeat superior theory, but instead under a theory of "direct liability by joint tortfeasors."  ECF No. 182 at 1.  JM points to its complaint, in which defendants Knauf and Johnson are referred to jointly as "Defendants," with no reference to vicarious liability.  *Id.* at 8.  Additionally, JM highlights specific alleged acts of wrongdoing by Knauf employees other than Johnson that justify its claim of direct liability against Knauf, including that Knauf employee emails referenced JM trade secrets (*e.g.*, ECF No. 182-3 at 2 (Johnson's email to Knauf employee Wlodarczyk noting that "C05 is an alloy from a former life"); ECF No. 182-4 at 2 (Johnson's email to several Knauf employs referring to RM4 as "JM Cobalt Chrome alloy," albeit referring to it as "free to practice")); Knauf employees generally knew the source of the RM-4 alloy was JM; and a vendor "challenged Knauf for passing off a JM specification for its own." ECF No. 182 at 9.  JM also argues that Knauf has continued using RM-4 since Johnson left the company, further indicating independent wrongdoing by Knauf.  *Id.*

The Court denies summary judgment on this claim.  First, I decline to infer a theory of respondeat superior where none was pled in the first instance.  Second, even if a theory of respondeat superior were implied as against Knauf, there are genuine issues of material fact precluding summary judgment on that basis.

Knauf argues that respondeat superior "mandates a legal status" between an employer and an employee, such that JM cannot choose to avoid the doctrine.  *See* ECF No. 188 at 2.

However, vicarious liability is a theory of liability to be argued affirmatively by the plaintiff, not a defense to be wielded as a shield by defendants in a motion for summary judgment. *See Palm Beach Golf*, 2013 WL 5972173 at *7 (emphasis added) (the "defendant was entitled to summary judgment due to the plaintiff's failure to *plead* vicarious liability in the complaint."). If vicarious liability can be waived by a plaintiff's failure to plead the theory, it cannot be raised by defendants as an "implied" theory that protects them from direct liability. *See also Newport News Industrial v. Dynamic Testing, Inc.*, 130 F.Supp.2d 745, 751 ("[O]ne cannot bring a claim of 'respondeat superior,' instead one simply relies on this theory as a vehicle for imposing on the principal liability for the underlying wrongful acts of the agent."). Here, as noted, JM chose not to raise this theory as a vehicle for imposing liability on Knauf, but instead chose to bring its claims against Knauf directly. I will not presume to now invoke such a theory on JM's behalf.

Even if Knauf were vicariously liable for some of Johnson's wrongdoing, Knauf's direct liability survives the dismissal of JM's claims against Johnson. Direct liability is not extinguished even when vicarious liability for related claims is. *See, e.g.*, *Booth v. Kit, Inc.*, 2008 WL 11327404 at *7–8 (D. New Mexico, 2008) (Kit's vicarious liability was extinguished when plaintiffs dismissed claims against three subcontractors, but Kit's direct liability for its own negligence survived).

Moreover, even if Knauf's claim of an implied theory of respondeat superior were correct, genuine issues of fact related to Knauf's misappropriation of trade secrets independent of Johnson would preclude summary judgment on this basis. JM disputes Knauf's contention that Knauf stopped using JM's specification trade secrets, pointing to Mr. Gaul's deposition that Knauf continued using JM trade secret specifications even after Knauf re-wrote its own specifications in 2011. ECF No. 182 at 2 (citing Ex. 1, Gaul Depo. Tr., 67: 20–68:5). Similarly,

JM disputes Knauf's contention that Knauf did not use test data apart from Dr. Johnson's use of that data, or after April 2014 (during which time Dr. Johnson was still at Knauf); JM points to examples of other Knauf employees using and sharing JM test data trade secrets. *See* ECF No. 182 at 2, ECF No. 165 at 3; ECF No. 165-2 at ¶ 69 (Mr. Gaul's report indicating that Knauf employees were aware of Dr. Johnson's use of JM testing data, knew that references to GX-4 and C05 came from JM, and discussed and reviewed JM's testing data as late as 2014). Finally, JM alleges that Knauf acknowledged its continued use of RM-4 after Johnson's termination, citing Ex. 5, Knauf 30(b)(6), Tr. at 69:10–70:22 ("Is there a compelling reason today for us to run away from RM-4? No."). ECF No. 182 at 3.

Thus, because JM did not bring its claims against Knauf under a theory of respondeat superior, and because there would be genuine issues of material fact regarding the application of that theory if it were implied, summary judgment on this issue is DENIED.

## ORDER

For the foregoing reasons, defendants' motion for summary judgment [ECF No. 161] is DENIED; defendants' motion for partial summary judgment [ECF No. 163] is DENIED; defendants' motion for partial summary judgment [ECF No. 164] is DENIED; and defendants' motion for summary judgment [ECF No. 165] is DENIED.

DATED this 22nd day of September, 2017.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge